And I'd like to reserve five minutes for that. Your name for the record, sir? I'm sorry? We have your name for the record. Oh, Paul Lucas from Stewart, Florida, representing Mr. Lassiter. Thank you, Mr. Lucas. Your Honor, this is an appeal from the summary judgment in the U.S. Circuit Court in Los Angeles. It's an appeal from a judgment that was displayed in approximately five seconds before the plaintiff's attorneys were able to sit down. Essentially, Judge Reel came out from his chambers and said, I have seen the two movies, I've seen one of the contrasts between the movies with Mr. Lassiter, and I grant summary judgment. At that time, there was no discussion of any of the elements that are made up in order to determine whether there's been a copyright infringement of a written piece of literature. Somewhat afterwards, after those few statements, the defendant was said, you may submit your unchallenged set of facts, which, of course, were challenged if you look at the lower court. This case, essentially, is about a young man, Darrell Lassiter, who wrote, who directed, and who produced a picture called Pay the Price. It was based from years prior on his experiences at Alabama State University and other university experiences from those universities against whom Alabama State competed. A historically traditional black college in the south is famous for its bands, its marching bands, because the football games are sometimes secondary. And they become extremely artistic. They have a great many different maneuvers that they do on the field that other bands don't do. Their training is rigorous, particularly in the freshman year, and then finally they graduate and move on and become primary band members. Pay the Price and Drumline are the only two pictures that have ever been done on a subject like this, and they both are handled essentially the same way. The sequence of events has been described by Linda Sager in detail, but there are two exceptions to that. The first is an introduction on the drumline in which a young man is in New York. He gets on the train and explains how he gets to the university. In Pay the Price, after the football game, after the battle of the bands, the young freshmen who survive are brought into the band, and they've succeeded in facing all of the obstacles. And all other things, the movies follow the same sequence. They express the same basic ideas through their characters, through some of the dialogue, and definitely some of the settings. I would disagree with Ms. Sager in only one item, and that is when she says on the climax of the picture, she says the climax in Pay the Price comes when all of these people are brought into the folk. But just before that, there is the battle of the bands, just as there's the battle of the bands at the end of Drumline. And the entire effort that's been put forth in these teams is to prepare for that particular battle. Curiously, there were four schools that were chosen by Mr. Lasseter, two in which came from Atlanta where he lived, Morris Brown and Clark Atlanta University, Florida A&M, and Bramley. When the bands were chosen for Drumline, they took exactly the same teams, only they were able to fly them in. The man, Mr. Lasseter, only had $250,000 for a budget, so he used some films with exactly the same bands. Access, I think we've demonstrated repeatedly in this film. In 1992, copyrighted portions of the script were sent to representatives of 20th Century Fox. In 1999, there is a copyrighted script, a copyrighted film, a copyrighted trailer, which Mr. Lasseter presented to several different people. The most important of those was to Dallas Austin through his assistant, Mr. Brackman, who describes himself as being the gateway to Mr. Austin. He lived with Mr. Austin. He traveled with Mr. Austin. And he had several conversations with Daryl Lasseter about that movie and at least one meeting with him, according to Mr. Brackman, more meetings than that, according to Mr. Lasseter. What was produced to him was a script, the movie, the press kit, the trailer, all of this. And that's important because Dallas Austin was the executive producer of Drumline, had gone originally to Hollywood and said, make a picture for me, my life story. I was a drummer in high school for one semester in the ninth grade. Develop it on a high school picture. All the earlier scripts work. Later, it's changed to college. Later, it's changed to one of those historical marching bands. Another contact had been through the writer, Chisholm III, who came to the campus and was approached twice by two people, individuals, one in a dining room and one outside in the field. And what we're told, do you know that there's a relationship between pay the price and between your movie? To one of these, she responds, yes, but ours is going to be different. We're aware of the film. Jack Stone, who's to Morris Brown and is asked by a student about the movie, he says, yes, I'm aware of it, but the movies are going to be different. And later in a newspaper said the real difference between these movies is the amount of money that was spent on them. What if a trial judge came out and said I viewed them both? And I have to say that when you look at both of them, they do not appear at first blush to be very similar. And in funky films versus Time Warner Entertainment, I mean, an actual reading and watching of the two works where it reveals greater, more significant differences and few real similarities in any of the extrinsic test factors, summary judgment's appropriate, correct? The basic conclusion is I don't necessarily agree that that was shown in the funky case or that that's similar to our own. In the funky case, there's several differences. First of all, you have a script and you have that versus the serial that's going on with the developing characters. When you take the script, you have one of the films is devastated, poor, run down in Connecticut. The other is fairly well to do. I mean, it's in good condition. It's in Los Angeles. In one, you have the death of a father, and he sort of disappears. And the other, you have a reemergence of the father who contacts or has relationships with the people who are in the funeral home. With one, you have sort of a wayward student, a man who comes back to take over that particular funeral home. With the other, you have an experienced businessman who does so. The younger sons are both one is suspected to be a homosexual, and the relationship there is limited. With the other, he definitely is. He went with a policeman named Keith, and the whole picture is developed that way. In the circumstance where you have the marriage of different girlfriends or have different girlfriends, one is based on religiosity. The other is not. However, they have certain characters. Certain people are the same. It's the same environment. You have the same funeral homes. In this picture, it's entirely different because you have the same sequence of events. You have one young man, Devin, in drumline, who comes and wants to make his life. He wants to develop his career and become a musician permanently on that team. Those that his same characteristics are developed in three separate people in the picture of the price, plastic man, white boy, and this thing. The same characteristics of those three are in Devin. When you go through the same beginning, you have the same introduction. You have the same uniforms. You have the same conflicts between the band directors and the administrations. You have the same conflicts between the band directors and the section leaders, and the section leaders and the people who are trying to get through. In one case, there's Devin. In the other case, there is the plastic man. Plastic man and Devin have two things in common. One is alcoholic and can't overcome that. The other can't write music, but they're both trying to overcome obstacles that they face with the band. They're both removed. They both come back and battle the bands, and they're safe there. One of the key scenes that shows that there's a copying that goes on here is the scene where the two young men, plastic man and Devin, are in a room, identical rooms. Then they have the – they're supposed to get up at 430. One doesn't get up until 436 by the clock. One, 438. Outside, there's a banging. One at the door and pay the price. The other one, they're drumming, and they have to get out. They're late. They're in the wrong uniforms. They have to be punished along with everyone else, and they do ten laps. It would be unrealistic to say that pay the price hadn't been seen by the people who made Drumline. The big difference is that there's $250,000 put in to pay the price by a relatively inexperienced producer, director, and writer. There are millions of dollars put in Drumline after Pay the Prices won an award for the Best Family Picture at the New York Film Festival, then produced at the Los Angeles Festival after copies have been sent to individuals who represent 20th Century Fox. And there's a big difference between those budgets and the experience of a large studio. But the sequences of the pictures, the basic plots, the way it is carried out, those concrete elements which are necessary have been well illustrated by Ms. Sanger. There is no one on the other side to say that there are so many dissimilarities that you don't really have a copying of the earlier picture. We don't know what the basis was by Judge Reel. We do know that much of the decision that would go in terms of whether there was an intrinsic value is wrapped up in the films. That is something that is often determined by the jury. That, in this case, is determined by Judge Reel. But there's no explanation whatsoever as to whether there are elements there or not elements that are common and similar. There's no ability to respond to that. Nothing has been submitted to the judge to do that. So we don't really know is the reasoning that went behind his decision. I wonder if you'd say a word about the attorney's fee award. I'm sorry? Would you talk about the attorney's fees award? Yes. The jury's fee award, first of all, we understand that an award is of attorney's fees and costs are frequently given to the victor in a particular case such as has happened here. However, those are usually discussed and the opportunity of the loser is to offer why he should not have those attorney's fees or that quantity of attorney's fees ruled against him is usually demonstrated or usually offered so he can show that this entire piece of litigation, that the entire effort to show a relationship with the two pictures, has actually advanced the cause of the copyright process because all of these issues have been copyrighted by the client. There are other issues, too, as to whether it's been unreasonable, whether he has been irrational, whether he has just pursued this as a frivolous lawsuit. And those things, I think, when you can see the efforts that this man put forth weren't there. They weren't discussed either. So we really don't know the basis for the award of fees, not the amount of fees, but the award of fees as to whether they should have been awarded that amount based on all of the elements. Well, he has something to that effect in his order. He said the claim was objectively unreasonable. I guess that's most of what he says. What he has said at the end. Now, he didn't discuss this. In his order, he gives the summary judgment, but he asked the defense counsel to provide him that list of uncontradicted facts. I'm talking about his order awarding attorney's fees. He finds that the award was proper because in light of the objective unreasonableness of plaintiff's claims. I mean, he's made that finding in his written order. He makes this finding after the summary judgment hearing, but there's no opportunity for that to be heard at a hearing where that is to be discussed by the plaintiff, who would certainly object to that, and demonstrate why they were reasonable, why it was not frivolous, and why this particular artistic work that was done by Mr. Lassner should be recognized. So suppose you lose on the underlying claim but win on the attorney's fees part of this. What would you have us do, send it back for him to explain his reasons? I mean, what exactly are you asking for here? If the court does not find, and it's this Court, does not find on the basis itself that there was no reason for granting those fees, that's what we would essentially have to do, because we would like at least the opportunity to present an argument as to why the judge's conclusion was inappropriate and why this is not a frivolous action, it was reasonable to go forward, and it did advance the cause of copyright  And I think that that one of those two, unless it was so onerous or so erroneous to this Court, it made that decision. Otherwise, the only alternative would be to remain. So there was no hearing at all on the attorney's fees. It was all done on the papers, and he entered his order. Do I understand that? That's correct. Okay. You mentioned you wanted to reserve five minutes. Thank you.  Thank you, Mr. Lucas. Good morning. I'm Louis Petridge, appearing for the 20th Century Fox Defendants. Good morning. I think I'd like to start in order of the comments that were made by counsel. The findings on the issue of substantial similarity were presented to the judge at the time our motion was filed. That's the practice in the Central District of California. So they were before the judge and before counsel at all times during the briefing, which went on for over a month period. And, in fact, as the record shows, the first time we appeared to argue the merits of the case, Judge Reel said that he hadn't seen the films and he wanted to put the matter over for two more weeks, so he had a chance to do that. And so counsel had additional time to prepare until we arrived at the hearing on the summary judgment. As often happens, the case was decided pretty much on the writing. And, in fact, in this kind of a case where parties and the experts, for all the writing and work they do, they really can't change the works, which are the only thing that really matters on the question of substantial similarity of protected expression. And so the judge granted summary judgment in a fairly short hearing and then announced that he would sign the findings that had been presented to him about a month earlier. Just to jump ahead to the attorney's fee issue, the attorney's fee motion was filed thereafter. Again, we presented a proposed order to the judge at the time we filed the motion. There was a hearing on the fee issue. Counsel did have a few things to say. It's not a long hearing, but it's in the record. It's a part of the excerpt of the record or the supplemental. And as we finished, the judge said he was going to grant the fee request as requested and sign the order as we were there in court. So there were attempts, there were opportunities by plaintiffs to present all of the issues that were discussed just now. I think the heart of this case and the heart of these motion picture cases is this, whether the two movies are substantially the same movie or whether there are slight differences or substantial differences. And as Your Honor pointed out, the Funky Films case, which is the last case we have in the Ninth Circuit on this, which was just decided last year, in fact, it was argued, I think, in this courtroom, was said that the court would look to see whether the works were substantially the same or substantially different. In this case, I think it's pretty easy. A story is really made up of the characters, the way that they relate to one another, and the essential sequence of events. It's true that they're about the same kinds of activities, that is, marching bands and black marching bands in the South. If these were two stories about baseball, you would have hundreds of similarities. We don't have to change the rules of baseball to tell the same story or to tell a story about the same subject matter. We don't have to run to third base and go around the opposite way in the diamond. So these stories here have the same essential facts, that being in a black marching band is like being in the Army, and there's a drill, and you have to get up early in the morning, and you have to work in the hot day sun so you wear white T-shirts, and you have to do what your supervisors tell you what to do. In this case, they're called section leaders or drum majors. And so that's the similarity between the works. But when you look to see what the movies are about, they're quite different. The plaintiff's work is about the travails of a young white man and a young black woman who want to join an all-black male band against the opposition of the section leader and the person who's in charge of the supervision of the band, Professor Light. And it all takes place in 1981, 21 years before our story, which takes place also in Atlanta for the reason that the person who was motivated to create our motion picture, Dallas Austin, lived in Atlanta and grew up there. Now our story, on the other hand, is about a talented young drummer from New York, from Harlem, who gets a scholarship to go to a southern university specifically to work in the band. And he has to learn about teamwork, and he has to learn how to read music. And the whole motivation of that story is to build up to the big day when they have the show. They lead up to the climactic battle of the bands. Well, if that's so, I missed it. I didn't see it in Pay the Price. It's pretty much hidden from view. And certainly there's no discussion in Pay the Price throughout the movie about how they're working up to the big day, the big battle of the bands. This case, there was a good deal of effort below to try to prove access. The case could be decided whether or not there is access. As your honors probably noticed in the Funky Films case, the trial judge assumed access for sake of argument and still found that the works were substantially different. The same can be done here. But on the issue of access, we have the fact that when this case was filed, plaintiff said that he made his submissions or there was access in the year 2000. Then they took the deposition of one of our screenwriters and found out she had written scripts for this movie in 1998 and 1999. So then the story changed. The story was the plaintiff thought maybe he remembers sending some scripts to 20th Century Fox in 1994, but there's no evidence of it. Then he said that there was a delivery in 1999 to Mr. Bratman at the office of Dallas Austin. Dallas Austin, the record shows, is a very talented and successful music producer. Mr. Bratman said people were always coming into the office and dropping stuff off. He does remember talking to the plaintiff and he also remembers that he threw everything away. But they were polite to people who would try to make submissions. There was a statement that the director of our movie admitted that he somehow knew about Pay the Price. Well, it's true that by the time the movie was being shot, that is our movie was being shot in Atlanta and was being shot in fact at the same school. There are five schools that you share a campus in effect or parts of the campus. Only three of them have marching bands and so these two movies happened to use facilities of two of them. By the way, they were also used prior to that by Spike Lee and his movie School Days. And there are a lot of films shot at these campuses. Well, it turns out that Mr. Lassiter's friend from school at Alabama was the director of one of the schools from Projects and he had a poster on the wall, Pay the Price. And several of the people working for Fox said they saw the poster and that was their awareness of Mr. Lassiter's work. That's not enough to show that they knew the story of Pay the Price. And that includes Charles Stone, the director. And Charles Stone also gave an interview after his movie came out and it was a big success and he was talking to somebody on the telephone. He was being interviewed and he was trying to be gracious and he said, I've never seen or read Mr. Lassiter's work, but I'm sure the only difference between the two of them is we spend more money on ours. That's not the same thing as saying I know what's in his motion picture. The other matter that was cited to the court was a statement by Ms. Chisholm, one of the screenwriters of Drumline. While she was on the set, she said a couple of days before she was ready to leave, there was a grip who had worked on School Days, had worked on Pay the Price, and had worked on Drumline, Mr. Bennett, and he seemed to be stalking her and he came up to her in a very accusatory way and said, your movie is like Pay the Price. Now, I took Mr. Bennett's deposition, it's in the record. At that time, Mr. Bennett had never read the script for Drumline. He thought they were similar because they were both being shot at the same schools. Which, by the way, is not an expression. In any event, Ms. Chisholm said, yeah, I'm aware of Pay the Price. She was aware because the posters were on the wall. She didn't say I know the story, and there's no evidence that she ever did. Now, when it comes to talking about the characters, the characters are a critical part of the story, of course. These characters couldn't be more different. You've got our lead character, Devin, comes from New York. They have no counterpart in their story. But what they're doing instead is they try to say, well, characters are made up of traits. It's like, he's brave, thrifty, obedient. I forgot the Boy Scout thing, but that's what they've done. They come up with about ten character traits, and they say, well, we have one who's brave, and we have one who's obedient, and we have one who's... That's the attempt to try to monopolize character traits. A character is made up of all the things that that character is and does, and there's no one like Devin. They say, well, they both have section leaders. Well, that goes with the territory. But the fact is, their section leader, Stan the Man, was a racist, sexist. He's almost a would-be rapist when he gets into the room with Miss Thang at the end when they're trying to harass her to get her to leave. Our section leader, who's named Sean, is simply a talented musician, somewhat a perfectionist, and who wants the best for the group. They've argued that in both works there's a young white male. Well, in theirs, the one they call White Boy, he's a victim. He's physically harassed throughout the movie until about the last five minutes. In one scene, his head is put in a window of a car, and they're driving the car down the road. This is quite different than the character Jason in our movie, who's one of several white males on the band. And except for some jokes about race, race is never an issue with Jason. And then you have their character, Miss Thang, who's the lead female. She's important because she wants to be the first female on this all-black male band in Pay the Price. As I said, she's more of a victim. She has to constantly avoid rape. The so-called hero of their story smacks her twice in the face and knocks her to the ground. And at the end, she marries Doc, the guy who saves her from the rape. We have several females in our movie. The lead is Layla, who is Devin's love interest, not at all like Miss Thang. And we have several female members of the band, including Deidre, who again is never a victim. There's no suggestion that anybody wants her off the band. So that's pretty much the way the characters line up. And as far as the sequence of events goes, interestingly enough, their expert didn't make a showing on sequence of events, because they're quite different. The fact is that in a very broad sense, you have initiates who are trying to get on the band, and that has made the band 25 percent of the way into the movie. And the rest of the story is about whether Devin is going to finally become a team member, and whether they're going to overcome their rival, Morris Brown, which is a real school. Morris Brown is on the campus. And whether they're going to be able to win the championship, which, like the movie Rocky and every other sports movie, has this great ending, because when it looks like Devin is going to be kicked off the team, he has to be brought back, he learns a lesson, everybody learns how to cooperate, and ultimately they win the championship. As far as the attorney's fees go, as I said earlier, findings were adopted by the court. There are excerpts of record 958 and 959. Was there any challenge before Judge Rios to the amount, or was it just to entitlement? No. We said that there were only conclusory challenges, but they didn't go through in an orderly fashion and try to challenge the amounts. It's a pretty big award for a summary judgment motion. It is, Your Honor. We had depositions in five states. A lot of them, last minute, we had to go to, we had to travel to the East Coast, I think, two or three times. Their expert witness was not available to us unless we went up to the Denver, Colorado area. And I traveled in Alabama, South Carolina, and Georgia to take depositions of their witnesses. And the case, by the way, was not filed in Southern California to begin with. Plaintiffs who have a Florida law firm, you have Alabama, I'm sorry, an Atlanta resident, and the case was filed in New York. And so we had the case transferred to Southern California, because at least the defendants were here. There were some parties that were here. Frankly, we thought that was a factor in the award, because if this case had been brought in Atlanta, where everybody goes to these marching band contests, you wouldn't have to educate anyone about the marching bands. It would have been obvious to them that these are, you're talking about things that everybody in Atlanta knows about. And so it would be obvious, all the more obvious, that the only similarities are generic to marching band experience. Unless Your Honors have questions of me, I have nothing further. Thank you. Mr. Lucas, back to you. If it please the Court, I'm going to skip around a little bit to a couple of the different issues that were brought up. Ms. Singer, by the way, on a period of at least nine pages in her declaration, which is approximately three pages between 8 and 9, describes in detail the sequences that were common between the two different movies. And I won't go into those, because it's a part of the record, only to indicate that she had shown that as a part of her expertise. But it does go on for three different pages. The characters. There are three characters that are developed that all have the same relationships with Mr. Devin, and they're all related to some portion of the general themes of the picture. The most significant is Plastic Man, who has the same battle, having a problem, violating the rules, continuously to ignore the rules until finally he is removed. But at the last moment, the administration comes in and says, if you want to have a band, if you want to compete, you're going to put him in. In Devin, it's different. He doesn't know how to read music. He's got to go back to learn how to read music. He can't be in the band. But again, there's an insistence, we need this drummer in the band, and so he is in the band. Those are very significant relationships. When they have a difficulty, as I explained before, waking up and going out and battling and having to run ten laps, it shows a relationship between the two. Now, the two white boys are both having difficulty. One is perhaps more than the other because you have a heavier theme in Pay the Price. And I'll go into that in just a moment in the other picture. But both are finding that when they do something wrong, they have to polish drums. Both of them have difficulties that are indicated either by racial remarks or attitudes. It's a little stronger in the one than it is in the other, but they both exist. This thing, white boy, all have problems with the parents. They've come here sometimes because the parents were prejudiced or difficult. So does Devin have a position with a parent. The characteristics of Devin are shown in these three characteristics of those three characters. And, again, we've got a man who is relatively new, producing his own movie, has produced his theme, shown in how they're expressed, and those are very, very close to what comes up early. Devin comes up later with Drumline. We're told that there were scripts that were started very early, and that those scripts of the movie, and it happened to be Miss Sheps, who was the woman who wrote them, show that Drumline, or whatever the name was of the picture, had been started. But as I've explained, it's a totally different picture. It's about high school. It is following the request of Dallas Austin in part about his life, although he had only spent one semester. It's a comedy. There are humorous things that are in that. When you move to the Drumline, and the scripts that occur in 2000, 2001, and they get ready to release the picture in 2002, each script, as pointed out by Miss Singer, gets closer and closer and closer to pay the price. There's another fellow up here, and it's put out in the records, called Tom Luce, who's a unit production manager. Tom Luce was asked to serve in that same capacity for pay the price. He was acquainted with pay the price. Later, he asks for a copy of that particular script. He is working together along with Director Stone and along with the writer. Both are making changes to the script as it goes out, so that the final products of both are very similar. One is a little cuter. Can't help that. All the themes are there. All the development of themes are there. The expressions of the themes are there. The battles between the director and, I mean, the band director and the administration, between the band director and the section leader, those are not necessarily common to experiences of all black marching bands, historically black marching bands in the South. They are to these two particular movies, because they set up conflicts which are eventually resolved through the movies. And that is a little bit more than just coincidence. There is a couple of other points. One of those is that there were objections that were raised to the entitlement for the reasons that I've explained before. And those did occur primarily in writing. They're primarily in the response to the motion for summary judgment, and they're in response to the briefs for this particular case. But, then again, it deals primarily with entitlement. The amount of fees is significant. And that's another thing. There's a question about why it was filed in New York. That is the headquarters of the defendant corporations. We do a lot of litigation. We as a firm, both state and federal, and frequently if we go someplace and we're not in the defendant's location, they have a right to move it there. We thought it certainly happened because Atlanta is a place where a lot of scenes took place. It's a lot of work. I mean, the scenes were built. It's where the characters were. It's where both Dallas Austin and Lassiter lived. But there's no other basis for putting it there. We would prefer to go to New York because we're in a Florida state, and we have as close as we get to Atlanta for all of those witnesses. But that's why we went there, and then it was moved from New York out here. They had New York counsel. They went to two or three hearings. It was accomplished before Judge Owens. But that doesn't mean that there's a tremendous amount of cost in here. We're also spending costs because when you have witnesses in different areas, it is usually necessary for you to go to the witnesses as opposed to bring the witnesses to you. Roberts. Your time is up, Mr. Lucas. Thank you. Thank you very much. The case just argued is submitted. Thank you, gentlemen.
judges: T.G. Nelson, Silverman , Leighton